No. 23-10414

═══════════════════════════════════════════

# In the
# United States Court of Appeals
# for the Fifth Circuit

───────────────────

PATSY K. COPE; ALEX ISBELL, AS DEPENDENT ADMINISTRATOR OF,
AND ON BEHALF OF, THE ESTATE OF DERREK QUINTON GENE MONROE
AND HIS HEIRS AT LAW,

PLAINTIFFS - APPELLANTS

V.

COLEMAN COUNTY,

DEFENDANT - APPELLEE

───────────────────

**On Appeal from the**
United States District Court for the
Northern District of Texas 6:18-CV-15

───────────────────

**Appellee's Petition for Rehearing En Banc**

───────────────────

Jon Mark Hogg
Jon Mark Hogg, P.L.L.C.
421 W. Concho Avenue
San Angelo, TX 76903
(Tel.) (325) 777-0455
jmh@jmhogglaw.com

---

## CERTIFICATE OF INTERESTED PERSONS

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Defendant-Appellee

Coleman County, Texas

### Intergovernmental Risk Pool

Texas Association of Counties

### Counsel for Defendant-Appellee

Jon Mark Hogg

Jon Mark Hogg P.L.L.C
421 W. Concho Avenue
San Angelo, TX 76903
[Tel.] (325) 777-0455
*jmh@jmhogglaw.com*

### Plaintiffs-Appellants

Patsy K. Cope, individually, and Alex Isbell, as dependent administrator of, and on behalf of, the Estate of Derrek Quinton Gene Monroe and his heirs-at-law

### Counsel for Plaintiffs-Appellants

T. Dean Malone

Michael T. O'Connor

Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730

Dallas, Texas 75202
[Tel.] (214) 670-9989
[Fax] (214) 670-9904
*dean@deanmalone.com*
*michael.oconnor@deanmalone.com*

Bruce K. Thomas

LAW OFFICE OF BRUCE K. THOMAS
12900 Preston Road, Suite 590
Dallas, Texas 75230
[Tel.] (214) 296-9650
[Fax] (214) 296-9650
*bthomas@bthomaslaw.com*

s/ Jon Mark Hogg
Jon Mark Hogg

Counsel of Record for Defendant-Appellee

**FED R. APP. P. 35(B)1 STATEMENT**

The panel decision conflicts with multiple prior decisions of this Court, including en banc decisions, regarding what constitutes a conditions of confinement case, and when one can be brought. Consideration of this case by the full court is necessary to secure and maintain uniformity of the court's decisions on this and other important issues impacting on municipal liability under 42 U.S.C. § 1983.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..............................................................................i

FED R. APP. P. 35(b)1 STATEMENT...................................................................................iii

TABLE OF AUTHORITIES..............................................................................................v

APPELLEE'S PETITION FOR REHEARING EN BANC.........................................................1

STATEMENT OF THE ISSUES.........................................................................................1

STATEMENT OF THE CASE............................................................................................1

STATEMENT OF NECESSARY FACTS...............................................................................3

ARGUMENT AND AUTHORITIES....................................................................................3

Introduction and Summary of the Argument...................................................................3

Panel Decision and Dissent...........................................................................................4

Court Should Grant Rehearing En Banc..........................................................................7

CONCLUSION AND PRAYER.........................................................................................14

CERTIFICATE OF SERVICE...........................................................................................15

CERTIFICATE OF COMPLIANCE....................................................................................17

COPY OF PANEL DECISION..........................................................................................18

# TABLE OF AUTHORITIES

## CASES:

*Anderson v. Dallas County*, 286 Fed. Appx. 850 (5th Cir. 2008) ................................. 10, 12, 13, 14

*Board of County Commissioners v. Brown*, 520 U.S. 397, 415 (1997)............................ 15

*Carswell v. Hunt County*, 3:20-cv-02935 N in the U.S. District Court for the Northern District of Texas Dallas Division.................................................................................. 16

*Cheek et al v. Hill County et al* Cause No. 6:21-cv-000396-ADA in the U.S. District Court for the Western District of Texas Waco Division ................................ 17

*Cope v. Cogdill*, 3 F.4th 198, (5th Cir. 2021) ..................................... ...........................1, 14

*Cope v. Coleman County*, 23-10414, 2024 WL 3177781,*9 (5th Cir., 2024) ....................... passim

*Estate of Henson v. Wichita Cnty*. 795 F.3d 456,453 (5th Cir. 2015)..................................... 6

*Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736 (5th Cir. 1997) ................................ 10, 11, 12, 13

*Garza v. City of Donna*, 922, F.3d 626 (5th Cir. 2019) ............... ..............................................10, 11, 12

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).................................................................8

*Hare*, 74 F.3d 633, 644-45 (5th Cir. 1996)(en banc) ................. ..............................................7

*Monell v. New York City Dept. of Soc. Servs.*, 436 U.S 658, 694 (1978)........................ 15

*Payne v. Clay County*, Cause No. 7:21-cv-00080-O in the U.S. District Court for the Northern District of Texas Wichita Falls Division.................................................. 17

*Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986).......... .........................................................15

*Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) ..................................................................1, 8, 9

*Scott v. Moore,* 114 F.3d 51 (5th Cir. 1997) (en banc)............. ..............................................4, 8, 10

*See*, *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)................................................. 16

*Shepherd v. Dallas Cnty.*, 591 F.3d 445, 455 (5th Cir. 2009) ... ...............................................7

*Sibley v. Lemaire*, 184 F.3d 481, 485 (5th Cir. 1999) ............... .............................................. 13

## APPELLEE'S PETITION FOR REHEARING EN BANC

## STATEMENT OF THE ISSUES

1.      Does the majority decision contradict this Court's en banc precedent in *Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) and its progeny which hold that a valid conditions of confinement claim can only exist if the injury is caused by the condition and it occurs without the fault of an employee's specific acts and omissions.

2.      Is consideration of this case en banc necessary to secure and maintain uniformity of the court's decisions on what constitutes sufficient pleading and evidence to support a conditions of confinement claim, and when a municipality can be held liable for the acts of its employees?

3.      Are trial courts required to analyze a case as a conditions of confinement claim even when it has not been sufficiently pleaded and the facts of the case would support only an episodic act or omission claim?

## STATEMENT OF THE CASE

This is the second appeal in this case. The first dealt with qualified immunity. *Cope v. Cogdill,* 3 F.4th 198, (5th Cir. 2021), cert. denied, 142 S.Ct. 2573 (2022) (Sotomayor, J., dissenting) ("*Cope I*"). On remand the trial court ordered the parties to provide a joint status report as to "any and all remaining claims that need to be adjudicated." (ROA.955). In the Joint Status Report

Plaintiffs stated the only claim remaining was their *Monell* claim for municipal liability. (ROA.956-960). The Joint Status Report filed July 12, 2022, did not include a condition of confinement claim. (ROA. 956-960).

Plaintiffs filed their First Amended Complaint on November 16, 2022. (ROA.1103-1156). In the "Introduction" to the First Amended Complaint Plaintiffs stated for the first time that they were "pleading facts which give rise to conditions of confinement and/or episodic acts and/or omissions claims, as appropriate, and ask that the court apply the correct legal theory or theories to the facts plead[ed]." (ROA.1109). The complaint did not plead any new, specific, separate or distinguishing facts to support a conditions of confinement claim other than those it relied upon for its episodic act or omissions claim.

Defendant moved for and the trial court granted summary judgment. (ROA. 2618-2621). Plaintiffs timely filed a Motion for New Trial or to Alter or Amend the Judgment. (ROA. 2723). The trial court denied this motion. (ROA. 2792). Plaintiffs timely appealed to this Court. (ROA. 2795). Oral argument took place on April 3, 2024. On June 26, 2024, the panel issued its per curiam opinion affirming the trial court's summary judgment as to the Monell policy claims for an episodic act or omission. *Cope v. Coleman County*, 23-10414, 2024 WL 3177781,*9 (5th Cir., 2024) ("*Cope II*"). The panel split 2-1 on the conditions of confinement issue, with Judge Smith dissenting. The majority vacated and

remanded the conditions of confinement claim to the trial court with instructions to consider that theory. Judge Smith dissented because Plaintiff's "so called" conditions of confinement claim did not exist as a matter of law, and the summary judgment should be affirmed in full. *Id*., at *9.

## STATEMENT OF NECESSARY FACTS

The facts of this case were accurately set out in the panel's decision in this case. No additional facts are necessary.

## ARGUMENT AND AUTHORITIES

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant is sensitive to the fact that rehearing en banc is rarely granted and requesting it should be reserved for the most important cases and under the most necessary circumstances. If the impact of the error by the majority in this case would be limited to this one case, Defendant would have sought only a panel rehearing or dealt with the conditions of confinement issue on remand. But the majority's error has far reaching consequences for hundreds of future pretrial detainees' cases that will be brought to this Court.

The majority decision on conditions of confinement contradicts this Court's en banc decision in *Scott v. Moore,* 114 F.3d 51 (5th Cir. 1997) (en banc) along with multiple other en banc and panel decisions. It creates a broader scope for conditions of confinement claims than this Circuit has previously

recognized. The impact of this decision goes far beyond this case. The result will be creating respondeat superior liability for county governments for the acts of their employees by using conditions of confinement as an artful dodge around the deliberate indifference standard. If this majority decision is not corrected it will broadly expand the use of conditions of confinement claims to avoid the deliberate indifference standard in what should be episodic act or omissions cases. For these reasons, the Court should take the extraordinary step of rehearing this one issue en banc.

**PANEL DECISION AND DISSENT**

The majority held that Plaintiffs had sufficiently stated a conditions of confinement claim because they alleged three of the county's policies have a "mutually enforcing effect" which "result[ed] in the deprival of *all* pretrial detainees' constitutional rights to adequate medical care and protection from known suicidal tendencies." *Cope II* at *8) (italics in original). It reasoned that "the Staffing, Do-Not-Enter, and Phone Cord Policies impose "durable restraints or impositions on inmates' lives" that transcend a single act or omission by an officer."" *Id.*, at *9. [1] While recognizing that Plaintiffs were seeking damages for

---

[1] It is important to note that the majority decision speaks in terms only of policies of the jail rather than the actual conditions at the jail. As will be discussed below, this blurs the line between individual liability, Monell liability for a custom, policy or practice and liability for conditions of confinement.

harm to a single detainee, the majority said that the alleged cause of harm was the broader "conditions, practices, rules or restrictions." *Id*. Thus, according to the majority, "Plaintiffs properly asserted a conditions claim and the district court should have considered such." *Id*. The majority remanded the case to the trial court to consider the conditions of confinement claim. *Id.*

Judge Smith dissented, because the conditions of confinement claim did not exist as matter of law and the majority holding was contrary to en banc and other precedent of this Court, specifically, *Scott v. Moore. Id*. Judge Smith disagreed with the majority because the standard for analyzing a pretrial detainees claim turns on whether it is classified as an "episodic act or omission" or a "condition of confinement." *Id*. Conditions of confinement claims "include only those claims in which the alleged harm is caused by a policy's "mere existence"—that is its "very promulgation and maintenance."" *Id*.

"So, for valid conditions-of-confinement claims, the alleged harm must occur without the fault of any specific jail employees' acts or omissions." *Id.* at *10, (citing *Estate of Henson v. Wichita Cnty*. 795 F.3d 456,453 (5th Cir. 2015)).

In other words, a policy's "mere existence" must be sufficient to bring about the alleged harm. *Id*. "Only then can it be said it was the policy itself that "cause[d] the pretrial detainee's alleged constitutional deprivation." *Id*., (citing

*Shepherd v. Dallas Cnty*., 591 F.3d 445, 455 (5th Cir. 2009) (quoting *Hare*, 74 F.3d 633, 644-45 (5th Cir. 1996)(en banc)).

Judge Smith went on to explain that in C*ope I*, the Court found that the jailer on duty, Jailer Laws, was deliberately indifferent to Monroe's serious medical needs when he failed to call EMS immediately after calling for backup as he was required to do by jail policy. *Id.* That determination cannot be reexamined in this appeal. *Id*. Because Laws conduct was unconstitutional, Monroe's death did not occur without the fault of a specific jail employee for his acts or omissions. *Id*., (citation omitted).

In finding to the contrary, the dissent continued, the majority "runs roughshod over longstanding and well-settled Fifth Circuit precedent, preferring instead to invent a rule from whole cloth." *Id*. That new rule is that "a conditions claim can rest on any policy that merely "imposes durable restraints or impositions on inmates lives that transcend a single act or omission."" *Id.* Under this rule, to state a conditions of confinement claim, thus avoiding the requirement to prove deliberate indifference, all a claimant must do is artfully allege that the source of the harm is a broader condition, practice, rule or restriction even if it involved the wrongful or unconstitutional conduct of an individual employee. *Id.*

**COURT SHOULD GRANT REHEARING EN BANC.**

Judge Smith's view is correct, and en banc review is necessary to correct this error to secure and maintain conformity of the Court's decisions and provide guidance to the lower courts. The majority opinion misstates and misapplies the law on conditions of confinement claims with dangerous consequences for this Circuit's jurisprudence. It contradicts this Court's en banc decision in *Scott v. More* and the cases that followed. This is evident from even a cursory reading of *Scott*.

In *Scott v. Moore*, this Court granted rehearing en banc to consider the proper application of *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) (en banc). *Scott*, at 53. *Scott* involved the sexual assault of a pretrial detainee by a jailer who was convicted and sent to prison for the crime. *Id*.

*Scott* noted that *Hare v. City of Corinth* had reconciled the circuit's caselaw regarding pretrial detainees. *Id.* In *Hare*, the Court held that determining which standard to apply in analyzing constitutional challenges hinges upon the classification of a challenge as an attack on a "condition of confinement" or as an "episodic act or omission." *Id*., (citation omitted). A "condition of confinement" case is a "[c]onstitutional attack on general conditions, practices rules, or restrictions of pretrial confinement. Id., (citation omitted). "Hence, where a detainee complains of the number of bunks in his cell or his television

or mail privileges, the wrong of which the detainee complains is a general condition of confinement." Id. [2]

An act or omission case on the other hand usually requires an actor be interposed between the detainee and the municipality such that the detainee first complains of the particular act or omission by the actor and then points derivatively to a policy, custom or rule or lack thereof that permitted or caused the omission. *Id.*  In other words, in a conditions of confinement case, it is the conditions themselves that constitute the harm. *Id*.

Scott's complaint was that the cause of the sexual assault was inadequate staffing, by having only one individual on duty, and/or by not having a female jailer for female prisoners.  *Id*. The court held that this was an episodic act or omissions case and not a condition of confinement because the harm was caused by the act of the officer, not the conditions of confinement.

Since *Scott*, jail suicide cases in this Circuit have almost always been recognized as episodic acts cases.  *See e.g.*, *Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736 (5th Cir. 1997); *Anderson v. Dallas County*, 286 Fed. Appx. 850 (5th Cir. 2008); *Garza v. City of Donna*, 922, F3d 626 (5th Cir. 2019).

---

[2] Footnote 2 of the opinion gave a list of things that had been held to be conditions of confinement including: revocation of telephone, television and cigarette privileges, disciplinary segregation, denial of visiting privileges, length of pretrial detention, overcrowding, and refusing drugs for rehabilitation

In *Flores*, plaintiffs sued for failure to provide adequate mental health care after the decedent committed suicide. *Flores* at 737. Flores attempted to raise both an episodic act or omission case (based on the sheriff's failure to set up special procedures to monitor against the decedent's potential suicide), and a condition of confinement case (based on the county's alleged failure to adequately staff and train the jail officials). *Id*. at 738. The court did not permit the plaintiffs to proceed under both theories. *Id*. It held where the sheriff's actions were interposed between the county and the decedent it was clear that the case was one for an episodic act or omission. *Id*. It was not error for the trial court to reject the conditions of confinement and apply the episodic acts or omissions test. *Id.*

In *Garza*, Garza's parents sued over his suicide in the Donna Police Department's holding facility. *Garza*, at 630. The District Court granted summary judgment on municipal liability, and Garza appealed. Id., at 632. The Garzas had brought a conditions of confinement theory, and numerous episodic act theories in the District Court, all of which were rejected. *Id.*

The conditions of confinement theory was based on the police chief ordering signs installed during critical moments when the suicide occurred. *Id*. at 633. The District Court declined to consider the case as a conditions of confinement case and instead treated it as an episodic acts case. *Id*.

The court affirmed holding that Garza's condition theory was an "attempt to fit a square peg into a round hole." *Id*., at 634. The court noted, "Prior conditions cases have considered durable restraints, or impositions on inmates lives like overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation or excessive heat." *Id*. (citations omitted).

Although *Garza* is the most recent, *Anderson* is the most instructive. In that case pretrial detainee Baines had committed suicide. *Anderson*, at 853-854. His surviving relatives sued for improper denial of medical care. *Id*., at 854. The court said that the first step in evaluating the case was to classify the challenge as an attack on either a condition of confinement, or an episodic act or omission. *Id*., (citing *Flores*, at 738). The court discussed examples in this Circuit's caselaw of what constituted a condition of confinement case and what constituted an episodic act or omission case. *Id*., at 857-858 (citations omitted). In its discussion the court wrote, "**Importantly, this court has not permitted plaintiffs to conflate claims concerning a prison officials' act or omission with a condition of confinement complaint**." *Anderson*, at 858 (citing *Flores*, at 737-738, and *Sibley v. Lemaire*, 184 F.3d 481, 485 (5th Cir. 1999) [emphasis added]. Noting that the Anderson plaintiffs argued they were entitled to proceed under either theory, the Court examined first whether they could proceed under a condition of confinement theory. *Id*., at 859. After evaluating

it, the Court agreed that this was not a conditions of confinement case and evaluated it under the episodic act or omissions analysis. Id.

The plaintiffs' argument in *Anderson* was that Baines would not have been able to commit suicide if proper precautions had been enacted in accordance with jail policy, and the complaint was that the employees had not followed jail policy, or that their failure to follow procedures resulted from county practices, namely, inadequate funding and staffing. *Id*. Even if true, the court went on, the state actors were still interposed between the detainee and the municipality such that their first complaint was of an act or omission by the actor. *Id*. Since plaintiffs could not prove that Baines was subject to cruel and unusual punishment without first proving that a state actor deprived him of his constitutional rights, the case was an episodic act or omissions case. *Id*.

As recognized by Judge Smith in his dissent, that is exactly the case here. This case is about the failure of the jailer(s) to timely intervene to either prevent Monroe's suicide or save his life by promptly seeking emergency medical assistance. In *Cope I* the court has already found that Jailer Laws committed unconstitutional conduct when he failed to immediately seek emergency medical assistance. The majority cannot now revisit that decision and hold it was not Laws at all but the policies themselves that caused the injury. The county's policies regarding Staffing, Do-Not-Enter and having long phone cords

in the cells did not result in Monroe's death, and Plaintiffs cannot prove they did without first pointing to Laws failure to timely call EMS in violation of county policy.

The reason maintaining the distinction between episodic acts or omissions and conditions of confinement cases is important is because municipalities cannot be held liable for the acts of their employees under the doctrine of respondeat superior liability. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S 658, 694 (1978). Local government, such as a County, can only be liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. This municipal liability is limited to "acts that are properly speaking acts of the municipality." *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986).

Where courts fail to rigorously adhere to this distinction, municipal liability collapses into *respondeat superior* liability. *See*, *Board of County Commissioners v. Brown*, 520 U.S. 397, 415 (1997). That is why this Circuit demands a high standard of proof before imposing *Monell*

liability on a municipality. *See*, *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).

Courts must also guard against attempts to use the conditions of confinement theory to get around the Monell and deliberate indifference standards. Under the guise of "conditions of confinement," the majority's decision went along with Plaintiff counsels attempt to blur and erode this distinction between the act of the individual employee, for which a municipality cannot be held liable, and the acts of the municipality.

Plaintiff's counsel is using this "dual theory" approach, in this case and others, to try and erode the distinction between episodic acts and conditions of confinement. The obvious goal is to create the equivalent of respondeat superior liability without the courts actually calling it that. Counsel has employed this strategy in a number of cases that have been or will be before this Court sooner or later. These include *Carswell v. Hunt County*, 3:20-cv-02935 N in the U.S. District Court for the Northern District of Texas Dallas Division; *Payne v. Clay County*, Cause No. 7:21-cv-00080-O in the U.S. District Court for the Northern District of Texas Wichita Falls Division; and *Cheek et al v. Hill County et al* Cause No. 6:21-cv-000396-ADA in the U.S. District Court for the Western District of Texas Waco Division.

In *Carswell,* which has been in this Court on appeal previously, plaintiffs assert the same "dual theory" of liability they assert in this case. In *Payne*, counsel also asserted the same "dual theory" approach. In *Cheek*, counsel recently supplemented the decision in *Cope II* in support of his Motion for New Trial to resurrect his conditions of confinement claim in that case. That case is soon likely to be appealed to this Court on this very issue.

This consistent strategy demonstrates that this is an important issue the court needs to consider en banc to secure and maintain conformity of its decisions on this important issue. This is an issue that will be coming before this court not only in this case, but in several others, and soon. This court, sitting en banc, should address it now.

## CONCLUSION AND PRAYER

The majority opinion contradicts en banc precedent of this court, and conflicts with other panel decisions. While denying it is doing so, it adopts a new standard for conditions of confinement cases and mandates suicide cases be considered under both an episodic act theory and conditions of confinement theory, under the same set of facts. This is error.

While nothing prohibits a party from pleading these two theories in the alternative, it is not the pleading but the facts of the case that determine what analysis applies. In this case Plaintiffs did not properly plead or present facts to

that would classify this as a conditions of confinement case. There was no error in the trial court granting summary judgment and the decision below should have been affirmed in full.

For these reasons, the Court should rehear this case en banc.

Respectfully submitted,

By:/s/ Jon Mark Hogg
Jon Mark Hogg
SBN:. 00784286

JON MARK HOGG PLLC
421 W. Concho Ave.
San Angelo, Texas 76903
jmh@jmhogglaw.com
(325) 777-0455

ATTORNEY FOR DEFENDANT-APPELLEE

## CERTIFICATE OF SERVICE

I certify that on July 10, 2024, the foregoing document was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the following registered CM/ECF users:

T. Dean Malone

Michael T. O'Connor

LAW OFFICES OF DEAN MALONE, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
[Tel.] (214) 670-9989
[Fax] (214) 670-9904

*dean@deanmalone.com*
*michael.oconnor@deanmalone.com*

Bruce K. Thomas

LAW OFFICE OF BRUCE K. THOMAS
12900 Preston Road, Suite 590
Dallas, Texas 75230
[Tel.] (214) 296-9650
[Fax] (214) 296-9650
*bthomas@bthomaslaw.com*

Counsel also certifies that on July 10, 2024, the foregoing instrument was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/.

Counsel further certifies that 1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; 2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and 3) the document has been scanned with Sophos Endpoint Diagnostic Utility and is free of viruses.

/s/ Jon Mark Hogg
Jon Mark Hogg

**CERTIFICATE OF COMPLIANCE**

1.      This Petition contains 3,345 words, including the statement required by Fed. R. App. P.35(b)(1).

/s/  Jon Mark Hogg
Jon Mark Hogg
COUNSEL FOR DEFENDANT-APPELLEE

Dated: July 10, 2024

**COPY OF PANEL DECISION**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2024

Lyle W. Cayce
Clerk

No. 23-10414

Patsy K. Cope; Alex Isbell, as Dependent Administrator of, and on behalf of, the Estate of Derrek Quinton Gene Monroe and his heirs at law

*Plaintiffs—Appellants,*

*versus*

Coleman County,

*Defendant—Appellee.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 6:18-CV-15

Before Smith, Haynes, and Douglas, *Circuit Judges.*

Per Curiam:[*]

This is the second appeal in this case, which concerns Derrek Monroe's suicide at the Coleman County Jail in 2017. In the first appeal, we held that the individual defendants—Coleman County Sheriff Leslie Cogdill, Jail Administrator Mary Jo Brixey, and Jailer Jessie Laws—were entitled to

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

qualified immunity. *Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2021) ("*Cope I*"), *cert. denied*, 142 S. Ct. 2573 (2022). Plaintiffs now return to this court to appeal the district court's grant of summary judgment on their municipal liability claims against Coleman County. For the reasons below, the district court's judgment regarding Plaintiffs' episodic-acts-or-omissions claim is AFFIRMED, but the judgment is VACATED and REMANDED for further proceedings regarding whether Plaintiffs have raised a genuine dispute of material fact as to their conditions-of-confinement claim.

## I.   Background

### A. Factual Background

On September 29, 2017, Monroe was arrested and booked at the Coleman County Jail. A medical screening form completed during intake indicated Monroe was thinking about killing himself, "wished [he] had a way to do it," and had attempted suicide two weeks earlier. The form also indicated Monroe had previously been diagnosed with "some sort of schizophrenia" and received mental health treatment. During booking, Monroe told Coleman County Sheriff's Deputy Ryan Tucker, "I want you to shoot me!" Tucker notified Sheriff Cogdill about the incident, and Cogdill helped Tucker finish the booking process.

Coleman County Jail has a "Mental Disabilities and Suicide Prevention Plan" ("Suicide Plan"), which establishes methods of supervision for suicidal detainees at various risk levels. According to that policy, people classified as low risk are checked every thirty minutes, people classified as moderate risk are checked every fifteen minutes, and people classified as high risk "receive [c]ontinuous or at least [five] minute observation." When Monroe was first incarcerated at the jail, he was observed every thirty minutes, which suggests the jail initially categorized him as low risk.

No. 23-10414

After Monroe's intake, an officer at the jail contacted Mental Health and Mental Retardation Services ("MHMR"). But Monroe had a seizure on his way to meet with the MHMR worker and was subsequently taken to the hospital. The hospital released him on the following day. Monroe was returned to the jail and placed in a cell with at least one other person. Shortly after returning, Monroe unsuccessfully attempted to hang himself using a bed sheet in his cell.[1] Laws observed Monroe's suicide attempt and called for backup. Cogdill, Tucker, and Laws then moved Monroe into a cell by himself and dressed him in a safety smock.[2] Monroe's new cell contained a telephone with a cord that was approximately two and a half feet long.

Later that afternoon, a MHMR crisis worker named Susan Quintana evaluated Monroe and recommended the jail place him on "highest suicide watch." Quintana told Brixey and Laws about Monroe's risk factors and suggested that Monroe be observed 100% of the time, particularly because he did not have a padded cell. She also talked with the sheriff about her recommendation. At the time, the jail allegedly did not have the capacity to constantly monitor a detainee. Monroe was observed every fifteen minutes that night, which aligns with the moderate risk category in the Suicide Plan.

The following day (Sunday, October 1, 2017), Laws started his shift at 7 A.M. Laws was the only officer at the jail that day, in accordance with an alleged Coleman County policy under which only one jailer is staffed at the jail during nights and on weekends. A witness who was also incarcerated in the jail that morning testified that he could hear Monroe saying for an hour,

---

[1] There is some evidence in the record that Monroe first tried to strangle himself with a blanket before attempting to hang himself.

[2] To decrease the risk of using a belt or other item of clothing for self-harm, the jail dressed people at risk of suicide in "safety smocks," also known as "suicide smocks." Laws testified that Cogdill made the decision to put Monroe in a safety smock.

No. 23-10414

"I'm going to kill myself. I'm going to kill myself. Please help me." The witness also heard Laws try to "talk [Monroe] down" and tell him everything was going to be alright.

At approximately 8:30 A.M., Monroe asked Laws for permission to shower.[3] Laws called Brixey, who told Laws to let Monroe shower and to get him a clean smock. Monroe went to the shower and back to his cell without incident, but he then became increasingly agitated. Laws reported that Monroe began to overflow his toilet, so Laws shut off the water to the cell and went to get a mop. Monroe began beating a plunger on his cell, and then beating the phone receiver against the phone. After sitting down momentarily, Monroe got up again, walked to the phone, and wrapped the phone cord around his neck. Jail surveillance video does not clearly show Monroe at that point, but his body appears to slump over. Meanwhile, Laws continued to mop while watching Monroe from outside the cell.

Laws reported that he "tried to talk [Monroe] down" and then notified Cogdill, Tucker, and Brixey. While waiting for backup, Laws did not enter Monroe's cell, obtain a rescue breathing device, or call emergency medical services ("EMS").[4] Laws later testified that his decision not to enter the cell alone aligned with his training and Coleman County Jail policy. Specifically, the Suicide Plan states that, if a suicide attempt is in progress, "[t]he correctional officer will enter the cell and attempt appropriate life saving techniques after backup-personnel have arrived."

_____

[3] These events are recorded in reports and also captured on a silent jail surveillance video taken from a camera outside Monroe's cell.

[4] The Suicide Plan states that, during a suicide attempt, "the correctional officer or jailer will . . . call the Emergency Medical Service." Laws later testified that he "d[idn't] know" why he did not call EMS but he would not do anything differently if given the opportunity.

No. 23-10414

Approximately ten minutes after Monroe wrapped the cord around his neck, Brixey arrived at the jail. Brixey and Laws then entered Monroe's cell together. Laws removed the cord from Monroe's neck. Brixey called EMS and requested an ambulance, during which time Laws found Monroe's pulse. Monroe did not appear to be breathing, so Brixey retrieved a breathing mask, which Laws began using on Monroe.

The paramedics arrived approximately five minutes after Brixey called EMS. Cogdill arrived around the same time. The paramedics took over administering emergency aid on Monroe and subsequently transported him to the hospital. Monroe died the following day. The plaintiffs' expert opined that if the cord had been removed in "less than at least 5 minutes," the damage to Monroe's brain would have been "lessened and more likely reversible."

Two years before Monroe's suicide, the Texas Commission on Jail Standards ("TCJS") issued a Technical Assistance Memorandum to all sheriffs and jail administrators in Texas, which reported that "four . . . suicide hanging deaths involving the use of telephone cords" had occurred in Texas jails over the previous eleven months ("Phone Cord Memorandum"). TCJS thus recommended that "**ALL** phone cords be no more than twelve (12) inches in length." A former Coleman County sheriff testified that the Coleman County Jail's policy manual was based on recommendations from TCJS and that TCJS approved the manual. But Cogdill testified that he had not seen the Phone Cord Memorandum before Monroe's suicide. Cogdill also testified that, after being elected sheriff in 2016, he did not find any folder or computer containing previously issued TCJS memoranda.

## B. Procedural History

Patsy Cope, who is Monroe's mother, filed suit under 42 U.S.C. § 1983 on behalf of herself and Monroe's estate (collectively, "Plaintiffs")

No. 23-10414

against Cogdill, Brixey, Laws, and Coleman County ("County").  On a previous interlocutory appeal, we held that Cogdill, Brixey, and Laws (collectively, "Individual Defendants") were entitled to qualified immunity, reversing the district court's contrary decision. *See Cope I*, 3 F.4th at 202. The Supreme Court denied review. *See Cope v. Cogdill*, 142 S. Ct. 2573 (2022).

Plaintiffs' claims against Coleman County then proceeded in the district court.  Plaintiffs filed an amended complaint, which made additional allegations regarding their municipal liability claims and attempted to clarify that they were relying on both conditions of confinement and episodic acts or omissions as alternative theories of relief.  Discovery ensued.  The County then filed a motion for summary judgment, arguing that our grant of qualified immunity to the Individual Defendants in *Cope I* was fatal to Plaintiffs' claims against the County.  The district court granted the County's motion. Plaintiffs filed a Motion for New Trial, or Alternatively, Motion to Alter or Amend Judgment, which the district court construed as a Federal Rule of Civil Procedure 59(e) motion and denied.

Plaintiffs timely appealed both the initial grant of summary judgment and the district court's denial of the reconsideration motion.

## II.    Jurisdiction and Standard of Review

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.  We have jurisdiction over the district court's grant of summary judgment pursuant to 28 U.S.C. § 1291.

We review grants of summary judgment de novo. *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014).  In conducting this review, we "view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor."  *Id.*  Summary judgment is proper when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## III.     Municipal Liability and *Cope I*

A municipality may be held liable for a constitutional violation "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). But "without an underlying constitutional violation, an essential element of municipal liability is missing." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (en banc) (alteration adopted) (quotation omitted). For example, in *City of Los Angeles v. Heller*, the Supreme Court held that a county could not be liable under § 1983 based on the actions of one of its police officers because a jury had already concluded that the police officer did not inflict any constitutional harm. 475 U.S. 796, 799 (1986) (per curiam); *see also Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (rejecting municipal liability in a similar situation).

The County argues—and the district court agreed—that *Cope I* concluded none of the Individual Defendants violated the Constitution, so *Heller* and its progeny resolve this case.[5] The law of the case doctrine ordinarily mandates that "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on subsequent appeal." *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (quotation omitted). Thus, according to the County, we are bound to conclude that the Individual Defendants did not cause any constitutional

---

[5] The County later conceded that *Cope I* did hold that Laws's failure to call EMS violated the Constitution.

injury to Monroe, meaning the County cannot be liable under § 1983 based on the actions of the Individual Defendants. *See Heller*, 475 U.S. at 799.

The problem for the County is that it misreads *Cope I*. In order to overcome qualified immunity, a plaintiff must show: (1) the defendant violated the plaintiff's constitutional rights, and (2) "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks and citation omitted). The Supreme Court has made clear that courts may assess only the second prong if that resolves the issue, meaning we need not reach the question of constitutionality if we conclude there has been no violation of clearly established law. *See id.* at 236–37.

In *Cope I*, we reached the question of constitutionality only on the issue of Laws's failure to call EMS. *See* 3 F.4th at 209 ("[W]e now make clear that promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency—e.g., suffering from a suicide attempt—constitutes unconstitutional conduct."). On every other alleged constitutional violation for each Individual Defendant, we held *only* that the defendant had not violated clearly established law. *See id.* at 208 ("We conclude that Laws's decision to wait for Brixey before entering the cell did not violate any clearly established constitutional right."); *id.* at 211 ("We therefore conclude . . . that Brixey's and Cogdill's holding of Monroe in a cell containing a phone cord did not violate a clearly established constitutional right."); *id.* ("Thus . . . no clearly established precedent suggested that Brixey and Cogdill could be liable under an episodic-acts theory for staffing the jail in line with Coleman County's budget and policies."). Accordingly, with the exception of Laws's failure to call EMS, we have never before

decided the constitutionality of the Individual Defendants' actions in this case, which distinguishes this case from *Heller* and its progeny.[6]

The district court therefore erred in holding that *Cope I* was fatal to Plaintiffs' *Monell* claims. Nevertheless, we "may affirm on any ground raised below and supported by the record, even if the district court did not reach it." *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 810 (5th Cir. 2016). Accordingly, we turn next to the question of whether Plaintiffs have otherwise raised a genuine dispute of material fact as to their claims.

## IV.  Plaintiffs' Claims against Coleman County

When determining the appropriate standard for analyzing an alleged violation of a pretrial detainee's constitutional rights, "we must first classify the challenge as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) (quotation omitted). In this case, Plaintiffs assert both theories in the alternative, so we address each in turn. *See Sanchez v. Young County*, 866 F.3d 274, 279 n.3 (5th Cir. 2017) ("*Sanchez I*") (per curiam) (stating "plaintiffs can bring a pretrial detainee case . . . under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement").

### A. Episodic Claim

To overcome summary judgment on their episodic claim against the County, Plaintiffs must raise a fact dispute as to whether (1) "County

---

[6] Both the County and the district court also relied on *Brown v. Lyford*—but in that case, we rejected the same logically flawed argument that the County makes here. *See* 243 F.3d 185, 191 n.18 (5th Cir. 2001) (stating that the court "must reach the question of whether [the officer] was a policymaking official for [the county]" in order to assess municipal liability, regardless of the fact that the officer had qualified immunity).

officials, acting with subjective deliberate indifference, violated [Monroe's] constitutional rights,"[7] and (2) "the County employees' acts resulted from a municipal policy or custom adopted with objective indifference to [Monroe's] constitutional rights." *See id.* at 280. To exhibit subjective deliberate indifference, a County employee must have "had subjective knowledge of a substantial risk of serious harm" and "responded to that risk with deliberate indifference." *See Cope I*, 3 F.4th at 207 (quotation omitted). "Deliberate indifference is an extremely high standard to meet but can be satisfied by a wanton disregard for an inmate's serious medical needs." *Id.* (alteration adopted) (internal quotation marks and citation omitted).

Plaintiffs assert that Cogdill, Brixey, and Laws violated Monroe's constitutional rights, and those violations resulted from County policy.[8] Thus, the question of the County's liability under an episodic-acts-or-omissions theory turns on the subjective deliberate indifference of the same officials granted qualified immunity in *Cope I*.[9] Under the law of the case doctrine, we generally cannot reexamine any issue of fact or law decided in

---

[7] Plaintiffs argue that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), requires us to apply an objective deliberate indifference standard here. However, after *Kingsley*, this circuit has continued to apply a subjective deliberate indifference standard in non-excessive-force actions alleging a violation of a pretrial detainee's constitutional rights based on episodic acts or omissions. *See, e.g., Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 & n.4 (5th Cir. 2017) (per curiam). *Cope I* followed that precedent when applying a subjective deliberate indifference standard to Plaintiffs' claims against the Individual Defendants. *See* 3 F.4th at 207 & n.7. Under the law of the case doctrine, the district court also correctly applied the subjective standard, and we must do so as well.

[8] Plaintiffs also mention Tucker, who has never been a defendant in this case. But, with the exception of failing to call EMS, Plaintiffs do not specify how Tucker allegedly violated Monroe's constitutional rights. Accordingly, he is not included in this analysis.

[9] Contrary to Plaintiffs' assertion, *Cope I* "express[ed] no view as to the viability" of Plaintiffs' *Monell* claims. *Cope I*, 3 F.4th at 211 n.13.

No. 23-10414

*Cope I*. *See Lee*, 358 F.3d at 320.  But, as discussed previously, *Cope I* did not reach the ultimate conclusion of whether the Individual Defendants violated Monroe's constitutional rights, with the exception of Laws's failure to call EMS.  Plaintiffs also supplemented the record after *Cope I* with additional evidence regarding subjective deliberate indifference, which we must consider. *Cf. Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010) (stating one exception to the law of the case doctrine is when "the evidence on a subsequent trial was substantially different").  Still, *Cope I*'s analysis remains highly relevant.

We turn to an assessment of whether any County employee exhibited subjective deliberate indifference to Monroe's safety, analyzing the actions of Cogdill, Brixey, and Laws in turn.

### i. Sheriff Cogdill

Cogdill knew that Monroe had attempted suicide on Saturday.  There is also evidence that Cogdill knew about Monroe's risk of suicide based on conversations with Deputy Tucker and the MHMR crisis worker.  Accordingly, we conclude that Plaintiffs have raised a fact dispute regarding Cogdill's subjective knowledge of Monroe's risk of suicide.  But that does not end the inquiry.

Another key question in this and the prior appeal is whether Cogdill knew about the risk that long telephone cords pose to detainees at risk of suicide.  In *Cope I*, we concluded that the existence of the Phone Cord Memorandum, by itself, was insufficient to create a fact dispute as to Cogdill's subjective knowledge of the risk posed by the cord in Monroe's cell. 3 F.4th at 210 n.11.  Specifically, we noted:

> [T]he Supreme Court has approved reliance on circumstantial evidence if the relevant risk "was longstanding, pervasive, well-documented, or expressly noted by jail officials in the past, and the circumstances suggest that the defendant-official being

sued had been exposed to information concerning the risk and thus 'must have known' about it." [*Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994)] (internal quotation marks omitted). There is nothing like that here and certainly no evidence that . . . Cogdill ever received or reviewed the [Phone Cord Memorandum] prior to Monroe's suicide.

Further, even at the summary judgment stage, it would go too far to infer that . . . Cogdill [was] aware of the Commission's recommendations simply due to [his] employment in the Texas jail system at the time the memorandum was written—just because information is *available* to a defendant does not mean []he has been *exposed* to it.

*Id.* (alteration adopted).

There is still no record evidence that Cogdill had actual knowledge of the risk of the cord in Monroe's cell. To the contrary, Cogdill testified that he did not see the Phone Cord Memorandum until after Monroe's suicide. He also testified that he never paid attention to the cord in the cell or thought that it would be a safety risk before Monroe's suicide. Nor is there evidence in the record that anyone in the Coleman County Jail had ever previously attempted suicide by strangulation with a telephone cord. *See id.* at 210.

After *Cope I*, Plaintiffs supplemented the record with additional evidence that they argue raises a fact dispute regarding whether Cogdill "must have known" about the substantial risk posed by the phone cord. *See Farmer*, 511 U.S. at 842–43. This evidence—which was not before the *Cope I* panel—includes: (1) testimony from Sheriff Wade Turner, Cogdill's predecessor, that the County's policies were based on TCJS recommendations; (2) TCJS's written testimony that it sent the Phone Cord Memorandum to all sheriffs and county jail administrators in Texas; (3) a MHMR crisis worker's testimony that the cord was an "obvious danger" and an objectionable "potential ligature"; and (4) a variety of public sources

No. 23-10414

that Plaintiffs argue demonstrate the risk of placing a suicidal detainee in a cell with a long cord was obvious.

Plaintiffs must raise a fact dispute under a heavy burden, and the new evidence, even viewed in the light most favorable to Plaintiffs, does not sufficiently demonstrate *Cogdill*'s knowledge.  TCJS may have distributed the Phone Cord Memorandum to all county sheriffs in 2015, but Cogdill was not sheriff at that time.  Furthermore, Turner, who was sheriff in 2015, testified that he was not aware of the Phone Cord Memorandum.  Although Turner testified that the Coleman County Jail's policy manual was based on TCJS recommendations, there is no evidence that it included any limits on phone cords in cells.  Cogdill also testified that he did not find any files or folders with TCJS memorandum when he became sheriff.  Critically, then, there is no evidence—circumstantial or otherwise—that the Phone Cord Memorandum ever reached Cogdill.

Nor have Plaintiffs succeeded in demonstrating that the phone cord was such an obvious risk that Cogdill must have known about it.  Many of the public documents submitted by Plaintiffs highlight isolated incidents of violence involving electronic cords occurring in places far from Coleman County, Texas.  A subset of the documents pertains to suicides in Texas jails, but those reports are not numerous enough or otherwise so pervasive and relevant as to show that Cogdill must have known about the risk of the phone cord in Monroe's cell.  As we said in *Cope I*, "just because information is *available* to a defendant does not mean []he has been *exposed* to it."  3 F.4th at 210 n.11.

Lastly, we cannot conclude that Cogdill's actions clearly demonstrate a wanton disregard for Monroe's safety.  Cogdill placed Monroe on suicide watch after intake, and Monroe remained on suicide watch while incarcerated at the jail.  After Monroe's first suicide attempt, Cogdill moved him into a

No. 23-10414

new cell without bedsheets, removed his clothing, and placed him in a safety smock. Cogdill was also available by phone on Sunday and arrived at the jail within sixteen minutes of receiving Laws's phone call. These reasonable responses to Monroe's risk of suicide, along with Cogdill's belief—albeit unsound—that Monroe's new cell contained no obvious ligatures, preclude a finding that Cogdill exhibited subjective deliberate indifference. *See Farmer*, 511 U.S. at 844.

### ii. Jail Administrator Brixey

Like Cogdill, Brixey did not have subjective knowledge about the risk of the phone cord, so she cannot have been subjectively deliberately indifferent to that risk. Brixey did have subjective knowledge about Monroe's risk of suicide, as evidenced by her conversations with the intake officer and the MHMR crisis worker. But Brixey took reasonable steps to address that risk. After Monroe's intake, Brixey placed him on suicide watch and ensured that the intake officer contacted MHMR and the magistrate. On Sunday morning, Brixey answered both of Laws's phone calls and arrived at the jail within approximately seven minutes of learning about Monroe's suicide attempt, which was approximately ten minutes after Monroe first wrapped the cord around his neck. After entering Monroe's cell, Brixey immediately called EMS. We conclude that Brixey's actions were reasonable responses to her knowledge of Monroe's risk of suicide and do not clearly show a wanton disregard for Monroe's safety. *Cf. Olabisiomotosho v. City of Houston*, 185 F.3d 521, 527 (5th Cir. 1999) (holding that two officers were not deliberately indifferent to a detainee's medical needs where one went out of his way to get her inhaler and the other informed booking personnel that she had asthma).

### iii. Jailer Laws

In *Cope I*, we determined that Laws's failure to call EMS violated the Constitution. *See* 3 F.4th at 209. However, we do not consider that

No. 23-10414

constitutional violation here because it did not "result[] from a municipal policy or custom adopted with objective deliberate indifference." *See Sanchez I*, 866 F.3d at 280. To the contrary, the County's Suicide Plan states that "[i]f a Suicide attempt is in progress, the correctional officer or jailer will . . . call the Emergency Medical Service." Because Laws's failure to call EMS violated County policy, it cannot serve as a basis for municipal liability. *See id.*[10]

Turning to Laws's other actions, we conclude that they do not meet the extremely high standard of subjective deliberate indifference. On Saturday, Laws observed Monroe on the surveillance camera tying a knot in a bedsheet, and he intervened before Monroe seriously hurt himself. After backup arrived, Laws assisted in moving Monroe to a cell without bedsheets and placing him in a safety smock. Once Laws arrived for his shift the next morning, he observed Monroe at least every fifteen minutes and watched him continuously for some periods. During that time, one witness heard Laws trying to comfort Monroe. When Monroe wrapped the cord around his neck, Laws noticed immediately and called for backup within one minute. Laws called three other County employees, one of whom arrived within seven minutes of the phone call.

---

[10] Plaintiffs argue that the County had a de facto policy of failing to timely call EMS, but they do not point to any such failure other than on the day of Monroe's suicide. That is insufficient to establish a routine practice or custom for purposes of *Monell* liability. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (noting a custom may give rise to *Monell* liability if it is "so persistent and widespread as to practically have the force of law"); *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) ("A customary municipal policy cannot ordinarily be inferred from single constitutional violations."); *see also Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 753 (5th Cir. 2023) (holding that two instances of inaction did not prove a widespread custom). Further, although the record does not contain evidence that Laws was reprimanded for his failure to call EMS, it also does not show that a policymaker "essentially ratified" Laws's actions. *See Piotrowski*, 237 F.3d at 578 n.18. Plaintiffs have thus failed to raise a fact dispute regarding the existence of this alleged de facto policy.

No. 23-10414

We note that "taking some reasonable precautions does not mean the officer, on the whole, behaved reasonably." *Converse v. City of Kemah*, 961 F.3d 771, 779 (5th Cir. 2020). Nevertheless, in light of the reasonable measures Laws took to prevent Monroe's suicide and his promptness in calling for backup, we conclude that his decision to follow County policy and wait for another officer to arrive before entering Monroe's cell does not evince a wanton disregard for Monroe's safety. Moreover, Laws's failure to retrieve the breathing machine while waiting for backup can only be classified as negligence, *see Cope I*, 3 F.4th at 208 n.8, which is insufficient to support a deliberate indifference claim, *see Hare v. City of Corinth*, 74 F.3d 633, 642 (5th Cir. 1996) (en banc). Accordingly, outside of Laws's failure to call EMS, he did not demonstrate subjective deliberate indifference to Monroe's safety.

* * * *

Plaintiffs have failed to identify any constitutional violation committed by a County employee that resulted from County policy. Thus, we affirm the district court's grant of summary judgment on Plaintiffs' episodic claim.

## B. Conditions-of-Confinement Claim

When a plaintiff brings a jail suicide claim under alternative theories of episodic acts and omissions or unconstitutional conditions of confinement, courts determine which theory applies based on an assessment of the facts alleged. *See, e.g.*, *Olabisiomotosho*, 185 F.3d at 526; *see also Sanchez I*, 866 F.3d at 279 & n.3.[11] Here, Plaintiffs argue that several unconstitutional County policies caused Monroe's death, including: (1) staffing only one jailer on

---

[11] Even the County acknowledged that the "court must determine whether, based on the facts alleged, the claims asserted fall under an episodic act or conditions of confinement theory."

16

No. 23-10414

nights and weekends ("Staffing Policy"); (2) instructing jailers not to enter an occupied cell alone and to wait to intervene until help arrives ("Do-Not-Enter Policy"); and (3) maintaining lengthy phone cords in jail cells ("Phone Cord Policy").[12]  According to Plaintiffs, the Staffing and Do-Not-Enter Policies create conditions at the Coleman County Jail under which no at-risk detainee experiencing a medical emergency at night or over the weekend can receive immediate attention, and the Phone Cord Policy increases the likelihood of a suicidal detainee experiencing a medical emergency under such conditions.  Plaintiffs thus argue that these three County policies have a "mutually enforcing effect" resulting in the deprivation of *all* pretrial detainees' constitutional rights to adequate medical care and protection from known suicidal tendencies.  *See Sanchez v. Young County*, 956 F.3d 785, 791, 795 (5th Cir. 2020) ("*Sanchez II*") (quotation omitted).[13]  In other words,

---

[12] As discussed previously, Plaintiffs have failed to raise a fact dispute regarding the existence of the alleged EMS Policy.  For the same reasons, Plaintiffs have failed to show that the County had a de facto policy of failing to timely administer CPR.  The alleged "suicide watch policy" appears not to be a standalone policy, but rather a combination of the Staffing and Do-Not-Enter Policies.  Plaintiffs also allege a County policy of "allowing suicide training for employees to lapse," but our court has held that failure-to-train claims are episodic.  *See Sanchez v. Young County*, 956 F.3d 785, 792 (5th Cir. 2020).  That leaves the Staffing Policy, Do-Not-Enter Policy, and Phone Cord Policy as potential bases for Plaintiffs' conditions claim.

[13] We note that "specific examples of other instances of detainees who suffered [Monroe's] fate as a result of [Coleman County's] polic[ies]" are not necessary.  *See Montano v. Orange County*, 842 F.3d 865, 876 (5th Cir. 2016).  Plaintiffs assert that every detainee at the Coleman County Jail who experiences a medical crisis is at risk of receiving constitutionally inadequate treatment due to the policies at issue here, which is sufficient to meet the "condition or practice" element of a conditions claim.  *See id.*

No. 23-10414

"the conditions themselves constitute the harm," *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc), regardless of any individual's act or omission.[14]

Under that theory, as in other conditions cases, the Staffing, Do-Not-Enter, and Phone Cord Policies impose "durable restraints or impositions on inmates' lives" that transcend a single act or omission by an officer. *See Garza v. City of Donna*, 922 F.3d 626, 633 (5th Cir. 2019); *see also Shepherd v. Dallas County*, 591 F.3d 445, 453 (5th Cir. 2009) (holding a claim alleging constitutionally inadequate medical care due to "poor or non-existent procedures and understaffing of guards and medical personnel" was a conditions claim); *cf. Scott*, 114 F.3d at 53–54 (concluding a claim was episodic where the plaintiff challenged a policy of having only one staff member on duty, but the harm—sexual assaults committed by the jailer on duty—was determined to be "an episodic event perpetrated by an actor interposed between [the plaintiff] and the city"). Plaintiffs seek damages for the harm to a single detainee, but—in contrast to episodic claims—the alleged cause of the harm is the broader "conditions, practices, rules, or restrictions." *See Sanchez II*, 956 F.3d at 791 (quotation omitted); *cf. Shepherd*, 591 F.3d at 452 (stating that, in episodic claims, "the focus of the

---

[14] The dissenting opinion appears to take issue with the fact that Plaintiffs also allege Laws's failure to call EMS contributed to Monroe's death. One fundamental problem with that argument is that it assumes an otherwise valid conditions claim—i.e., one alleging that the conditions alone are sufficient to cause the harm—cannot survive if an individual's actions *also* contributed to the alleged harm. This court has never said that, either in *Estate of Henson v. Wichita County* or otherwise. *See* 795 F.3d 456, 464 (5th Cir. 2015) (stating only the well-established principle, which is consistent with this opinion, that episodic claims "fault specific jail officials for their acts or omissions rather than conditions, practices, rules, or restrictions" (internal quotation marks and citations omitted)). To the contrary, in *Sanchez I* (not cited by the dissenting opinion), the plaintiffs alleged that both the conditions of confinement and the individual actions of employees caused the detainee's suicide, and this court held that the district court erred by failing to consider the conditions claim in addition to the episodic claim. 866 F.3d at 279–80.

No. 23-10414

claim is one individual's misconduct"[15]). We thus conclude that Plaintiffs properly asserted a conditions claim, and the district court should have considered it as such.[16]

Accordingly, we vacate and remand for the district court to consider in the first instance whether Plaintiffs have raised a genuine dispute of material fact on their conditions claim. *See Sanchez I*, 866 F.3d at 279 (vacating and remanding under similar circumstances "[i]n deference to the trial court's responsibility to review the record in the first instance").

## V.    Conclusion

The district court erred in concluding that *Cope I* foreclosed Plaintiffs' claims against the County in this case. Nevertheless, for the reasons set forth herein, the district court's judgment regarding Plaintiffs' episodic-acts-or-omissions claim is AFFIRMED. However, we VACATE and REMAND the district court's judgment for further proceedings regarding whether Plaintiffs have raised a genuine dispute of material fact as to their conditions-of-confinement claim.

---

[15] The dissenting opinion alleges that this statement and another in this paragraph constitute a "new rule." But what is clear from the majority opinion, and omitted from the dissenting opinion, is that these principles are quoted directly from prior Fifth Circuit caselaw. We are bound by the law of the case doctrine to follow them.

[16] Plaintiffs are correct that they need not demonstrate a County employee's deliberate indifference in order to succeed on their conditions claim. *See, e.g., Shepherd*, 591 F.3d at 454–55. If Plaintiffs can show the conditions at issue are not reasonably related to a legitimate government objective, the court "permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *see also Hare*, 74 F.3d at 644 (noting that a state's imposition of a rule during pretrial confinement "manifests an avowed intent to subject a pretrial detainee to that rule or restriction" and, "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices").

JERRY E. SMITH, *Circuit Judge*, dissenting:

The majority correctly affirms the summary judgment for plaintiffs' "episodic act or omission" claims. But it commits egregious error in vacating the summary judgment on the so-called "conditions-of-confinement" claim. That claim, as a matter of law, does not exist, and the summary judgment should be affirmed in full. I respectfully dissent.

Derek Monroe attempted suicide by strangulation and died after jailers failed to render timely emergency assistance. Given those facts, plaintiffs' *Monell* claim can be classified as nothing other than an attack on "episodic acts or omissions."

The standard for analyzing a pretrial detainee's constitutional claim turns on its categorization as a challenge to an "episodic act or omission" or, instead, to a "condition of confinement." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). The former deals with claims "where the complained-of harm is a particular act or omission of one or more officials." *Id.* The latter, by contrast, includes only those claims in which the alleged harm is caused by a policy's "mere existence"—that is, its "very promulgation and maintenance." *Id.* at 53–54.

So, for valid conditions-of-confinement claims, the alleged harm must occur *without* the fault of any "specific jail employees' acts or omissions." *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 464 (5th Cir. 2015) (cleaned up). In other words, a policy's "mere existence" must be sufficient to bring about the alleged harm. *Scott*, 114 F.3d at 53.[1] Only then can it be said that it

---

[1] Claims failing to meet that requirement must be episodic, because they require an employee to do more than act as "a dispenser of intended conditions or restrictions." *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc). The question then becomes, *inter alia*, "whether that [employee] breached his constitutional duty." *Id.*

No. 23-10414

was the policy itself that "cause[d] the pretrial detainee's alleged constitutional deprivation." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 455 (5th Cir. 2009) (quoting *Hare*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc)).

Plaintiffs' conditions-of-confinement claim fails that test. Monroe's death occurred after a jail employee (1) acted unconstitutionally and (2) violated county policy.

(1) In *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021) ("*Cope I*"), a prior panel determined that Jessie Laws's failing timely to call for emergency medical assistance "was [] unreasonable and an effective disregard for the risk to Monroe's life," *id.* at 209. *Cope I* therefore concluded that Laws's response "constitute[d] unconstitutional conduct." *Id.*; *see also* Op. at 14. That determination and that conclusion are issues "decided on appeal [that] may not be reexamined . . . by the appellate court on subsequent appeal." *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (quotation omitted).

(2) Laws was not acting as a mere "dispenser of intended conditions or restrictions" when he engaged in that unconstitutional conduct. *Hare*, 74 F.3d at 645. Quite the opposite. As the majority expressly concedes, "[his] failure to call EMS *violated* County policy." Op. at 15 (emphasis added). So Laws's response was *wholly unrelated* to the County's "implement[ing] . . . an identifiable intended condition or practice." *Hare*, 74 F.3d at 645.

Given (1) and (2), just one conclusion can possibly follow: Monroe's death did not occur without the fault of a "specific jail employee for his acts or omissions." *Estate of Henson*, 795 F.3d at 464 (cleaned up). To put it another way: None of the three policies—in isolation or combination—is sufficient to bring about the actual harm Monroe suffered by virtue of its "very promulgation and maintenance." *Scott*, 114 F.3d at 53. Consequently,

No. 23-10414

the complaint's factual allegations foreclose plaintiffs' conditions-of-confinement claim.

Yet, somehow, the majority concludes to the contrary. In so doing, it runs roughshod over longstanding and well-settled Fifth Circuit precedent, preferring instead to invent a rule from whole cloth.

Under the majority's new rule, a conditions claim can rest on any policy that merely "imposes durable restraints or impositions on inmates' lives that transcend a single act or omission." Op. at 17 (cleaned up). Events are characterized based on the alleged "focus of the claim"—i.e., per its theory, a claim is episodic if the allegations "focus" on "one individual's misconduct." Op. at 18 (cleaned up). That is grave error.

For starters, the majority's rule is strictly prohibited by our circuit's time-honored rule of orderliness. Unavoidable is the majority's conflict with legions of our circuit's panel and en banc holdings—so much so that its own citations prove the point.

Take, for example, its describing *Scott*. As stated by the majority, *Scott* concluded that a claim faulting "a policy of having only one staff member on duty . . . [for] sexual assaults committed by the jailer on duty" was *episodic*. Op. at 18 (citing *Scott*, 114 F.3d at 53–54). That's because the staffing policy's mere implementation is insufficient to bring about Scott's alleged harm.[2] She would not have suffered harm had the jailer not "breached his constitutional duty," *Hare*, 74 F.3d at 645, by "entering [her] cell[] and sexually assault[ing] her," *Scott*, 114 F.3d at 52.

Per that description, *Scott* is legally indistinguishable from the matter at hand. None of the three policies identified in the complaint—in isolation

---

[2] Put bluntly, the *Scott* policy did not command jailers sexually to assault prisoners.

No. 23-10414

or combination—was sufficient to cause Monroe's harm by virtue of its "very promulgation and maintenance." *Scott*, 114 F.3d at 53. So too with *Scott*'s policy of staffing one jailer. Like the jailer in *Scott*, Laws had to act unconstitutionally and contravene jail policy for Monroe to suffer the harm he experienced.

So, the very caselaw the majority cites fatally undercuts its conclusion. Its attempt to distinguish *Scott* is utterly futile. It musters just one—that the claim at issue in *Scott* was episodic because "the harm . . . was determined to be 'an episodic event.'" Op. at 18.

That makes negative sense, as the distinction is internally contradictory. Just two pages earlier, the majority expressly (and correctly) states that a claim's categorization turns on facts *internal* to the complaint. *See* Op. at 16 ("determin[ing] which theory applies based on an assessment of the facts alleged" (citation omitted)).

But that's all but ignored by the majority when it comes time to distinguish *Scott*. Now, dispositive are qualities inherent to the type of harm experienced. So, for reasons unstated and still unknown, the majority regards sexual assault harms—but not suicides—as just the kind of harm that is "episodic."

Never mind that the basis for such a distinction undoubtedly turns on facts *external* to the complaint. But that's the least of the problems with this imagined distinction.

The majority's distinction, if true, would render incomprehensible *this very case*. To defend the proposition that a claim's categorization turns on the qualities of an alleged harm, the majority must accept the premise that

No. 23-10414

any one particular harm gives rise to either an episodic or conditions-of-confinement claim—but not both.[3]

That mires the majority in a factual quandary from which it cannot escape. In *Cope I*, this court considered plaintiffs' episodic claims alleging the *exact same* harm before us now. *Cope I* held, under an episodic-acts theory of liability, that such harm was the result of Laws's failing timely "to call for emergency assistance [for] a detainee . . . suffering from a suicide attempt." 3 F.4th at 209.

The upshot is blissfully ironic. Under the majority's reasoning, *Cope I*'s holding—which is binding on this panel as law of the case—would *foreclose* the possibility of plaintiffs' conditions-of-confinement claim.

The majority can pick its poison. It can admit that a complained-of harm's qualities have no bearing on determining a claim's categorization. Or it can stick to its guns and insist that certain harms—such as sexual assaults—are cognizable only as "episodic harms." Picking the former concedes that *Scott* is indistinguishable, thereby placing the majority into an irreconcilable conflict with en banc precedent. Choosing the latter places suicides in the episodic-harm category, rendering the majority opinion internally contradictory. So, either way, the majority cannot avoid the inescapable conclusion—that plaintiffs' conditions-of-confinement claim must fail.

The destruction that is sown by the majority extends well beyond the facts of this case. Its reasoning effectively eliminates the objective deliberate-indifference requirement for episodic claims.

_____

[3] That is, after all, the very basis of the majority's distinguishing *Scott*. Rejecting that premise would require the majority to concede that *Scott* is indistinguishable, since a so-called "episodic harm" would be legally indistinguishable from a "conditions-of-confinement harm," at least for purposes of categorizing a *Monell* claim.

Case: 23-10414     Document: 61-1     Page: 25     Date Filed: 06/26/2024

No. 23-10414

Recall that the majority suggests that events can be characterized based on the "source of the harm" on which a claimant's allegations "focus." Op. at 18. That effectively categorizes claims solely on the basis of *ipse dixit*—now, to raise a conditions claim, claimants need do nothing more than artfully "allege[]" that the "source of the[ir] harm is [a] broader condition[], practice[], rule[], or restriction[]." *Id.* (quotation omitted).[4]

But that cannot be, for the legal analysis applicable to each of the two categories of claims is wholly distinct.[5] Only conditions-of-confinement claims permit "the jury reasonably [to] presume that the government acted with the requisite intent to punish."[6] *Shepherd*, 591 F.3d at 455. For episodic-acts claims, however, "intentionality is no longer a given," because a jail employee can act with subjective deliberate indifference to a detainee's constitutional rights *independently of* any intent to punish on part of the governmental unit. *See Hare*, 74 F.3d at 649 n.4.

Under the majority's newly-announced rule, claimants are but one artful pleading away from recasting their episodic claims into ones challenging conditions of confinement. The majority has therefore granted claimants, armed with nothing but their own *ipse dixit*, the benefit of pre-

---

[4] Indeed, under the majority's rule, the claim in *Scott* would fall into the conditions-of-confinement category. That's because Scott's "amended state petition . . . complain[ed] generally of inadequate staffing," 114 F.3d at 53, which would be a "broader condition or practice," Op. at 18 (cleaned up).

[5] Though the threshold for liability for both is "functionally equivalent." *Shepherd*, 591 F.3d at 455 (quoting *Hare*, 74 F.3d at 643).

[6] That follows from the premise that the governmental unit promulgates and implements policies only for the purpose of achieving some goal. *See Hare*, 74 F.3d at 644–45. If a policy creates a condition that bears no reasonable relationship to any legitimate governmental objective, then—by process of elimination—punishment is the only remaining justification for what is an otherwise senseless policy. *See Shepherd*, 591 F.3d at 452 (citation omitted).

No. 23-10414

suming that the governmental body intended *any and all* harms caused by *any and all* of its employees' episodic acts and omissions.

That is plainly impermissible, as it holds municipalities liable for the constitutional violations of its employees *absent* any showing of its acting with "objective deliberate indifference to the detainee's constitutional rights."[7]

In sum, the majority has gone out of its way to keep on life-support plaintiffs' supposed conditions-of-confinement claim—notwithstanding its obvious lack of merit. Worse, the majority disposes of longstanding and well-established Fifth Circuit precedent and runs amok on the rule of orderliness. Worse still, it leaves us with an inscrutably vague rule that holds governmental entities liable for the subjective deliberate indifference of its employees.

I respectfully dissent.

---

[7] *Hare*, 74 F.3d at 649 n.4 (emphasis removed); *see also Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)).

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 26, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:   Fifth Circuit Statement on Petitions for Rehearing
             or Rehearing En Banc

        No. 23-10414    Cope v. Coleman County
                        USDC No. 6:18-CV-15

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 35, 39, and 41
govern costs, rehearings, and mandates.  **Fed. R. App. P. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and Fed. R. App. P. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  Fed. R. App. P. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
<u>certiorari</u> in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

The judgment entered provides that each party bear their own costs
on appeal.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Mary Frances Yeager, Deputy Clerk

Enclosure(s)

Mr. Jon Mark Hogg
Mr. Thomas Dean Malone
Mr. Bruce K. Thomas